THOMAS A. WOODS and GEORGIALY W. WOODS, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Woods v. Commissioner
Docket No. 7120-72.
United States Tax Court
T.C. Memo 1974-198; 1974 Tax Ct. Memo LEXIS 117; 33 T.C.M. (CCH) 861; T.C.M. (RIA) 74198; July 31, 1974, Filed. Thomas A. Woods and Georgialy W. Woods, pro se. Howard S. New, for the respondent. *118 QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the income tax of petitioners for the taxable years 1968 and 1969 in the amounts of $489.54 and $1,006.55, respectively. Due to concessions by the parties, the sole question before the Court is whether any of the amounts paid petitioner Thomas A. Woods by the University of Texas Southwestern Medical School from National Institute of Mental Health grants in each of the taxable years 1968 and 1969 for his participation in that school's residency program in general psychiatry is excludable from gross income as a fellowship grant under section 117. [2]
FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners are Thomas A. Woods and Georgialy W. Woods, husband and wife, whose legal residence at the time of the filing of the petition herein was Dallas, Texas. They filed timely joint Federal income tax returns for the taxable years 1968 and 1969. Thomas *119 A. Woods (hereinafter referred to as "petitioner") received a Doctor of Medicine Degree from the University of Texas Southwestern Medical School, Dallas, Texas (hereinafter referred to as "Southwestern") in June of 1962. [3] Southwestern is an organization described in section 501(c) (3) and exempt from tax under section 501(a). He was licensed by the Texas State Board of Medical Examiners to practice medicine in the State of Texas in December of 1962. In June of 1963, petitioner completed a one-year rotation internship at the Sacramento County Hospital in Sacramento, California. In July of 1968, petitioner entered a 3-year residency program in general psychiatry at Southwestern. Petitioner completed his residency in July of 1971. The residency program at Southwestern was coordinated with several hospitals in the Dallas area, including Parkland Memorial Hospital (hereinafter referred to as "Parkland") and Presbyterian Hospital of Dallas (hereinafter referred to as "Presbyterian"). [4] The residents *120 would often be rotated through several of these affiliated hospitals during the course of their training, in addition to being assigned to certain psychiatric clinics operated by Southwestern. The clinics were organized to provide certain facilities or experience that was required for an approved residency in general psychiatry but was not available at any of the affiliated hospitals. [5]
From July through September of 1968, petitioner was assigned to Parkland. Parkland, in conjunction with Woodlawn Hospital (hereinafter referred to as "Woodlawn"), is operated by the Dallas County Hospital District (hereinafter referred to as "DCHD"), a public body created and organized under the laws of the State of Texas primarily for the purpose of supplying medical *121 care to indigent and needy residents of Dallas County. Pursuant to an agreement between the DCHD and Southwestern in 1967, it was agreed that Southwestern would be responsible for staffing both hospitals with "a sufficient number of qualified physicians to adequately direct and supervise professional medical services to all inpatients and outpatients" at Parkland and Woodlawn. Accordingly, the permanent staff at both hospitals is drawn directly from the faculty of Southwestern, and the doctors who serve as heads of the departments, divisions, or services of Southwestern, assume the same positions of authority at the hospitals. In exchange therefor, Southwestern was granted the opportunity to use the hospitals' facilities for clinical teaching and research for its medical students, interns, and residents under conditions of actual responsibility for patient care. Parkland is a general hospital which serves as the primary teaching facility of Southwestern and is located immediately adjacent thereto. Woodlawn is a special hospital which is located at some distance from Southwestern and is primarily devoted to the treatment and care of adolescent and adult patients with serious *122 mental and nervous disorders. Both hospitals admit patients on the basis of their medical need rather than restricting admissions to cases involving unusual teaching aspects. [6]
The residents were appointed to these hospitals by the DCHD upon the nomination of the chiefs of the appropriate department, division, or service responsible for the supervision and training of such personnel. Pursuant to the terms of the above agreement, the expense of hiring such interns or residents was borne entirely by the DCHD although Southwestern agreed to assist where it was able to obtain special funds for the training programs of certain interns and residents. During his assignment to Parkland for the third quarter of 1968, petitioner worked at the hospital 7 days a week, 6 hours per day. In addition, he was on emergency *123 room call approximately every eighth day, including weekends and holidays. Weekday emergency call required staying at the hospital for 15 hours, while weekend call required 24-hour attendance. While on emergency room call, he was the only physician of his service physically present at the hospital. Petitioner's duties at Parkland were similar to those of any salaried staff physician and included direct responsibility for the care of all patients on his assigned ward; being in charge of the outpatient clinic; direct responsibility for the diagnosis and treatment of patients; acting as a consultant on referrals from other specialties; prescribing drugs; writing patients' histories; discharging patients; admitting and physically examining patients. Patients were assigned to petitioner on the basis of rotation, not on the basis of the training aspects of the case. From October of 1968 through June of 1969, petitioner was assigned to Presbyterian. Presbyterian is a general hospital located in Dallas whose principal function is to furnish medical aid and hospital care to private patients admitted by the medical staff of the hospital. It admitted patients on the basis of medical *124 need and did not restrict admissions to cases involving unusual teaching aspects. As a hospital affiliated with the Southwestern residency program, its consulting staff was composed of many faculty members from Southwestern. The duties petitioner was required to perform at Presbyterian during this period were substantially identical to those required to be performed at Parkland, including emergency room call. Patients were assigned to him on the basis of rotation. As with Parkland, his work was subject to close supervision and direction by the medical staff at the hospital. Being listed on the house staff at both Parkland and Presbyterian, petitioner was neither registered as a student nor was a candidate for any academic degree. [7]
Almost all of the duties performed by the petitioner and other residents for the DCHD and Presbyterian would have required the attention of a staff physician had the petitioner and other residents not been available. The additional presence of the residents enhanced the quality of medical care the DCHD and Presbyterian offered its patients. From July through December *125 of 1969, petitioner was assigned to Parkland in a consultation service capacity and was also on emergency room call approximately every eighth night, including weekends and holidays. Requests for consultation were taken in rotation and required approximately 3 hours per week. In addition, petitioner was also assigned to the Child Psychiatry Clinic at Southwestern (hereinafter referred to as "CPC"). While at CPC, petitioner carried a three to four patient load and spent approximately 7 patient-related hours per week in connection with his duties at the clinic. Petitioner spent an additional 2 hours a week with his supervisor in consultation about his patients. All patients requesting help through the clinic could not be seen. Instead, patients were selected depending on the teaching needs of the clinic at the time. An attempt was made to accept a wide range of problems in children of various ages from different cultural groups. During the time petitioner was assigned to the CPC, he was expected to do and did diagnostic evaluation of his patients and, on occasion, their families. In addition, he saw patients regularly in therapy sessions. Fees for care were determined by a *126 sliding fee scale which considered the monthly income of the patient's parents, the number of dependents and their debt status. After determining these factors during the initial interview, the resident would set the patient's hourly fee according to a published fee schedule. Fees ranged from approximately $1 to $20 per hour depending upon the financial status of the patient's parents. The activities of petitioner relating to his assignment to the CPC were subject to the direction, supervision, and control of the staff of the clinic. The training the petitioner and other residents in child psychiatry received from the duties they performed at Parkland, Presbyterian, and the CPC was essential for an approved residency in child psychiatry. Another prerequisite was formal didactic instruction by means of prepared lectures, seminars, assigned reading, roundtable conferences, journal clubs and lectures by visitors. Throughout his residency, petitioner attended such didactic instruction which, dependent upon his rotation, would account for approximately 15 to 20 hours a week. During the entire period in question, petitioner was under contract with the DCHD. By the terms of the *127 contract, he agreed to "conform to all rules and regulations governing the institution, discharging all duties of House Staff Officer as determined by the Management and Staff." Upon satisfactory completion of his duties as a resident or intern, the DCHD agreed to issue a certificate indicating satisfactory performance of such duties. Such certificate would be forfeited if he failed to remain in service for the full time of his contract. The contract further provided that petitioner was prohibited from engaging in any form of private practice except in those instances which had been given prior approval and which applied to all members of the house staff. While on house staff at Parkland, petitioner had Federal income and insurance contribution act taxes withheld from monthly payments from the DCHD which kept employee records of petitioner reflecting an hourly wage rate and a specific job code number. Petitioner also received 2 weeks paid vacation per year, free hospitalization coverage and medical care, free laundry for uniforms, a meal allowance, sick leave, and was eligible to join the DCHD employees credit union. During 1968 and 1969, petitioner received $2,596.55 and $6,183.61, *128 respectively, from the DCHD. Petitioner did not exclude any of these amounts from gross income during the years in question and has conceded they represent compensation for services rendered to Parkland and Presbyterian. He received no separate amounts from Presbyterian itself.
Petitioner also received during 1968 and 1969 the sums of $2,311.80 and $6,618.30, respectively, from Southwestern for his participation in that school's residency program. None of the amounts paid to petitioner by Southwestern was determined on the basis of financial need, but on the basis of a fixed sum for each level of residency, increasing yearly as the resident attained additional skill and experience. The source of these funds was the U.S. Department of Health, Education and Welfare, Public Health Service, National Institute of Mental Health (hereinafter referred to as "NIMH") trainee stipend grants to Southwestern. The NIMH publication entitled "Grants and Awards of the National Institute of Mental Health for Graduate and Undergraduate Training" (December 1966) states the primary purpose of such grants is "to improve the quality of mental health training; to enlarge the capacity for training *129 people; to help in the development of specialized awards, to enable a greater number of persons to pursue careers in the mental health disciplines and related areas." The publication further provides that such grants are not awarded directly to individuals by the NIMH but that the training institutions are charged with the disbursement of funds. Aside from a few minimal educational and citizenship requirements, the selection of qualified recipients is left entirely up to the discretion of the grantee institution. Receipt from Southwestern of such training stipends funded by the NIMH grants was conditioned upon satisfactory participation in all aspects of the residency program. Those residents who received equivalent amounts of money from other sources were not selected for NIMH grants so that a uniformity of pay scale could be maintained at each level of residency. [8]
*130 On his joint income tax returns for 1968 and 1969, petitioner excluded from gross income $1,728.50 and $3,600.00 of the above amounts received from Southwestern as excludable fellowship grants. Respondent contends none of the amounts received from Southwestern is excludable. OPINION The sole question for our determination is whether any of the amounts paid to petitioner by Southwestern from NIMH grants in each of the taxable years 1968 and 1969 for his participation in that school's residency program in general psychiatry is excludable from gross income as a fellowship grant under section 117. The facts of this case are indistinguishable in substance from those in Geral W. Dietz, 62 T.C. [*] (July 31, 1974), with which this case was consolidated for purposes of trial. For the reasons stated therein, we hold that none of the amounts received by petitioner from Southwestern in 1968 and 1969 qualifies for exclusion under section 117. In accordance with the above, Decision will be entered for the respondent . Footnotes
1. The following cases were consolidated herewith for purposes of trial only: Geral W. Dietz and Johanna C. Dietz, docket No. 7147-72; Donald D. and F. Diane Fagelman, docket No. 7633-72; Byron L. Howard, Jr. and Sharon K. Howard, docket No. 8532-72. Separate opinions will be issued for each case. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Petitioner Georgialy W. Woods is a party to this proceeding only by virtue of having filed a joint return for the years in question with her husband, Thomas A. Woods. ↩
4. The official title of the program was "Southwestern Medical School Affiliated Hospitals Residency Program." ↩
5. In order for a residency program to be approved by the American Board of Psychiatry and Neurology and the Council on Medical Education of the American Medical Association, it had to meet the requirements of the Essentials of Approved Residencies, which are published by the Council for each specialty or service. ↩
6. During 1968 and 1969, Parkland admitted over 330 psychiatry inpatients and had an average daily psychiatry inpatient census of more than 40, representing 14,600 inpatient days. With respect to psychiatry follow-up matters, approximately 6,000 persons or an average of 16 or 17 persons per day were treated through the hospital's outpatient clinic and emergency room. ↩
7. House staff is a term used to refer only to residents and interns. ↩
8. For instance, the residents in psychiatry who were assigned to either the Veterans Administration Hospital or Terrell Hospital, which was run by the State of Texas, would receive as a base salary from those hospitals the equivalent of what petitioner received from the DCHD and the NIMH grants combined. ↩